1
2
3          UNITED STATES DISTRICT COURT
4              DISTRICT OF NEVADA
5                    * * *

6    JANET BROWN, *et al.*,                     Case No. 3:19-cv-00207-MMD-CSD

7                         Plaintiffs,              Member Cases:
                                                3:17-cv-00295-MMD-WGC
8        v.                                      3:19-cv-00424-MMD-WGC
                                                3:19-cv-00418-MMD-WGC
9    UNITED STATES OF AMERICA,
                                                     ORDER
10                        Defendant.
     _____
11   AND CONSOLIDATED ACTIONS AND
     THIRD PARTY ACTION
12

13   **I.    SUMMARY**

14          This consolidated case arises from a fatal plane crash at the Reno-Tahoe

15   International Airport ("RNO"). Plaintiffs[1] sued the United States of America under the

16   Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1) and 2671-2680,[2] alleging that

17   the negligence of Federal Aviation Administration ("FAA") air traffic controllers at RNO was

18   the sole cause of the crash. The Court held a bench trial (the "Trial"). (ECF Nos. 148-156

19   (minutes of proceedings); *see also* ECF Nos. 158-165 (trial transcripts).) The Court makes

20   the below findings of fact and conclusions of law following the Trial. And as further

21

22          [1]Plaintiffs are the Brown Parties, consisting of Janet Brown, Laura Melendez, John
     Bradley Brown, the estate of John Brown aka Johnny Brown, and Flying Start Aero, LLC
23   (ECF No. 170 at 1-2), and the Elliker Parties, consisting of Jocelyn Elliker, Carrie Romo,
     as the parent and guardian ad litem for B.E., Megan Romo Elliker, individually and as the
24   Executor of the Estate of James Elliker, Dustin Elliker, and Katelynn Hansen (ECF No.
     171 at 1). The Court refers to the two sets of Plaintiffs as the Brown Parties and the Elliker
25   Parties herein.

26          [2]The Court has jurisdiction over this case under this statute. (ECF Nos. 115 at 3,
     170 at 24, 172 at 5.)  *See also, e.g.*, *Hamilton v. United States*, 497 F.2d 370, 372 (9th
27   Cir. 1974) (noting case alleging negligence of air traffic controllers arose under FTCA but
     not noting a lack of jurisdiction). Venue is also proper because the crash occurred at RNO.
28   *See* 28 U.S.C. § 1402(b).

1  explained below, the Court finds in pertinent part that Plaintiffs failed to establish by a

2  preponderance of the evidence that the air traffic controllers' negligence caused the crash.

3  To the contrary, the government proved that the pilot's negligence caused the crash by a

4  preponderance of the evidence and that the air traffic controllers did not breach their duty

5  of care. The Court accordingly will direct judgment in the government's favor.

6  **II.    FINDINGS OF FACT**

7        The Court makes the following findings of fact based on the testimony and other

8  evidence admitted during the course of the Trial,[3] along with the pre-trial and post-trial

9  briefing the parties filed in this case.[4]

10       1.    The plane that crashed was a Beechcraft A-36 Bonanza (Registration No.

11  N985CA). (ECF No. 115 at 3.)

12       2.    The Bonanza was on the final leg of the traffic pattern (coming in for a

13  landing) for Runway 16 Left at RNO when it encountered wake turbulence (also known as

14  wake vortices)[5] from a FedEx Boeing 757 landing ahead of it on Runway 16 Right, a

15  parallel runway. (*Id.*)

16       3.    The Bonanza's encounter with the FedEx 757's wake vortices caused John

17  Brown, the pilot of the Bonanza, to lose control of it. (*Id.*) The plane hit the ground, killing

18  Brown and his sole passenger, James Elliker, and destroying the plane. (*Id.*)

19  ///

20

21      [3]The parties submitted joint exhibits, marked as Nos. 1-80, as well as separate
22  exhibits, with Plaintiffs' marked as Nos. 100-135 and the government's marked as Nos.
    500-781. (ECF Nos. 123, 123-1, 123-2, 123-3.) "Ex." in this order refers to an exhibit
23  admitted at Trial.

24      [4]As the Court ultimately agrees with the government's positions in this case, the
    Court's findings of fact and conclusions of law are largely adopted from the proposed
25  versions of both the government submitted to the Court.

26      [5]The forces that lift an aircraft create wake turbulence. High-pressure air from the
    lower surface of the wings flows around the wingtips to the lower pressure region above
27  the wings. This produces a pair of counter-rotating vortices, which extend behind and
    below the aircraft's flight path. The vortices from a larger aircraft can overturn a smaller
28  aircraft that encounters them with disastrous results. (*See* Ex. 34 at 362.)

2

4.      At the time of the crash, Brown was an FAA certified flight instructor with over 11,000 hours of flight time. (*Id.*) Brown was the CEO and primary instructor for Flying Start Aero, LLC, "a flight school and Cessna Pilot Center based at RNO." (*See id.*)  In 2015, the FAA awarded Brown the title of "Master Pilot" in recognition of his "professionalism, skill, and aviation expertise for at least 50 years while piloting aircraft." (ECF No. 165 at 4-5.)

5.      Elliker was a co-founder and president of Victory Woodworks, Inc., in Sparks, Nevada. (ECF No. 161 at 16.)

6.      At the time of the crash, Brown and Elliker were returning from a one-day trip to southern California. (ECF No. 163 at 4-9.)

7.      Visual Metrological Conditions ("VMC") existed at the time of the crash, and Brown was operating the flight under Visual Flight Rules ("VFR"). (ECF No. 115 at 3.) Pilots are required to maintain vigilance when flying in VMC. (ECF No. 164 at 94.)

8.      RNO tower controllers provide air traffic control services to aircraft operating within a zone close to the airport, known as "Class C" airspace. (ECF No. 158 at 198.) *See also* 14 C.F.R. § 71.51. Such airspace generally consists of a five-mile inner ring going from the surface to 6,000 feet above the airport elevation. (ECF No. 159 at 185.)

9.      At the time of the accident, air traffic controller Gregory Nicoll operated the local control position at the RNO tower. (ECF No. 158 at 140.) Erik Edney operated the ground control and clearance delivery positions. (*Id.* at 271.) Edney also served as the Controller-In-Charge of the RNO tower at the time. (*Id.*)

10.     But as Brown approached RNO on the ultimately tragic flight on August 31, 2016, before he entered the Class C airspace that surrounds it, Brown was first in contact with air traffic controllers from the Northern California Terminal Radar Approach Control ("TRACON") facility, which controls the airspace surrounding the area of responsibility of the RNO tower. (*See* Ex. 25 at 0044:35 UTC to 0045:04 UTC; *see also generally id.*)

///

1        11.     At 5:44:35 p.m. on the day of the crash, Brown contacted a Northern
2   California TRACON controller, Mark Ward. Brown advised Ward that he was 35 miles to
3   the southeast of Reno. In subsequent communications, Brown requested to land on
4   runway 25 at RNO. (*See id.*)

5        12.     At 5:54:10, as Brown was approximately 8 miles southeast of RNO, Ward
6   informed him that there would be a delay for runway 25, and that he was number four in
7   the sequence for landing at the airport.[6] Ward also informed Brown that his traffic–"*a*
8   *Boeing seven fifty-seven"*–was on a "*15-mile straight in*" for runway 16R. (*See id.* at
9   0054:10 UTC.)

10        13.     At 5:54:18, Brown responded, *"yeah understand we can take runway one*
11  *six left."* Ward replied, "*five Charlie alpha, proceed to the uh downwind and contact Reno*
12  *tower one one eight point seven.*"  In response, Brown stated, "*okay, contact the tower,*
13  *thanks for the help, five Charlie alpha.*" (*See id.* at 0054:21 to 0054:26 UTC.)

14        14.     Sure enough, Brown's next radio contact was with the RNO tower. At
15  5:54:33, Brown contacted the RNO tower, stating, *"reno tower, good afternoon, bonanza*
16  *nine eight five charlie alpha, restricted heading three five zero, eight thousand five*
17  *hundred."*  (*See* Ex. 26 at 0054:33 UTC.)  This means that, at the time of this transmission,
18  Brown's Bonanza was located southeast of RNO at 8,500 feet in elevation, heading north
19  on a heading of 350 degrees.

20        15.     Nicoll responded that Brown should proceed to runway 25, and Brown
21  confirmed that he understood. (*See id.* at 0054:50 UTC to 0054:58 UTC.)

22        16.     Brown then asked Nicoll if there were any restrictions. (*See id.* at 0055:09
23  UTC.)

24  ///

25

---

26       [6]American Airlines Flight 1497, then UPS Flight 9706, then FedEx Flight 1359, and
27  then Brown's Bonanza. (ECF No. 159 at 102-105.) Brown either knew, or should have
     known, there were three aircraft ahead of him and their general locations and intentions
28  from listening to the radio transmissions between air traffic control and those airplanes.
     (*Id.*)

1      17.     Nicoll did not respond to Brown. Nicoll instead began conversing with FedEx

2  Flight 1359, UPS Flight 9706, and American Airlines Flight 1497, during which

3  conversation Nicoll cleared FedEx Flight 1359 to land, and FedEx Flight 1359 confirmed

4  its plan to land. (*See id.* at 0055:38 UTC to 0056:15 UTC.) Nicoll also advised FedEx Flight

5  1359 that there was another Boeing 757 cleared to land on Runway 16 right ahead of it.

6  (*See id.* at 0055:51 UTC.) FedEx Flight 1359 confirmed it received this transmission. (*See*

7  *id.* at 0056:00 UTC.)

8      18.     Nicoll expected Brown to have been listening to these radio communications

9  with the other three aircraft to paint a mental picture of where his traffic was located. (ECF

10  No. 158 at 223-24.)

11      19.     Indeed, from the radio transmissions, Brown should have known there were

12  three aircraft ahead of him at RNO and their general locations and intentions. (ECF No.

13  164 at 134-136; *see also supra* n. 6.)

14      20.     At 5:56:20, Brown advised Nicoll in the RNO tower that he was, *"on a wide*

15  *downwind one six left."* Nicoll responded, "*roger continue inbound for one six left.*" Brown

16  responded, "*wilco,*" meaning he would comply.  (*See* Ex. 26 at 0056:20 UTC to 0056:32

17  UTC.) This means that Brown and Nicoll agreed Brown would land on Runway 16 L.

18      21.     At 5:57:13, Brown told Nicoll that he "*is turning a wide left base[7] for one six*

19  *left.*" (*See id.* at 0057:13 UTC.) Nicoll explained at Trial that Brown initiated this base turn

20  himself, not at Nicoll's direction. (ECF No. 158 at 251-52.)

21      22.     When he initiated his base turn operating under VFR, Brown was required

22  to maneuver his aircraft to RNO in such a way as to see and avoid other aircraft and avoid

23  their wake turbulence. (ECF Nos. 159 at 163, 228-29, 164 at 94.)

24  ///

25

26      [7]Pilots and controllers utilize rectangular traffic patterns to maintain an orderly
takeoff and landing flow. (ECF No. 144 at 17 n.8 (citing Ex. 34, Chapter 14 at 22-23).) An
27  airport traffic pattern, such as the one at RNO, has five legs. (*Id.*) For landing, the legs are
called the "downwind" (typically in the direction of the wind), "base," and "final." (*Id.*) A "left-
28  hand pattern" means the airport is off to the pilot's left when on the downwind. (*Id.*)

23.     At 5:57:18, in response to Brown's report that he was turning a wide left base, Nicoll issued the following traffic advisory, cautionary wake-turbulence advisory, wind information, and clearance to Brown: "*bonanza five charlie alpha roger, traffic niner mile final for one six right is a boeing seven fifty seven, caution wake turbulence, wind two six zero at one three, gusts one eight, runway one six left, cleared to land.*"  (*See* Ex. 26 at 0057:18 UTC.)

24.     At 5:57:31, Brown replied: "*cleared to land one six left negative contact on the inbound for the right five Charlie alpha.*" (*See id.* at 0057:31 UTC.)

25.     At 5:58:18, within one minute of his prior transmission advising he was looking for traffic on his right, Brown reported: "*and tower five charlie alpha got a visual on the airliner for the for the right.*" (*See id.* at 0058:18 UTC.) This was the final recorded transmission from Brown.

26.     During the approximately one-minute period between the time when Nicoll advised Brown of a Boeing 757 on a nine-mile final, to the time Brown reported "*a visual on the airliner*," FedEx Flight 1359 continued inbound and was at approximately a six-mile final. (*See* Ex. 105 at Figure 1 (included below).)



Figure 1 - Graphic showing N985CA radar plot of flight path in relation to the radar plot of the flight path of FDX1359.

27.     At the same time, UPS Flight 9706 also was on final to runway 16R, much closer to the runway, and about a half mile from landing. (*See id.* at Figure 2 (included below).)



Figure 2 - Graphic showing N985CA radar plot of flight path in relation to the radar plot of the flight path of UPS9706.

28.     UPS Flight 9706 was not Brown's traffic. (ECF Nos. 163 at 18-19, 164 at 165.)

29.     While there was a significant dispute between the parties at Trial regarding which of the two Boeing 757s Brown said he had a visual on, the Court agrees with the government and finds that Brown must have seen and been referring to FedEx Flight 1359 at the moment he said he had a visual on the airliner to the right.

30.     This conclusion is first supported by the two diagrams above, which show that FedEx Flight 1359 was off to Brown's right while UPS Flight 9706 was if not straight ahead of him, then ahead and slightly to the left. The yellow lines in the diagrams support

this. These diagrams were admitted at Trial. (ECF No. 157 at 11 (noting that Ex. 105 was admitted on July 5, 2022).)

31.    This conclusion is next supported by taking a still of a contemporaneous radar recording—also admitted as an exhibit at Trial (*id.* at 28)—at the moment that Brown said he had a visual of the airliner on the right.



(Ex. 597 at 00:58:18; *see also* Ex. 26 at 0058:18 UTC ("*and tower five charlie alpha got a visual on the airliner for the for the right*").) At the moment that Brown made this transmission, FedEx Flight 1359 was off to his right, not UPS Flight 9706, which was up ahead of him slightly to the left.

32.    This conclusion is further supported by the radio traffic that immediately followed Brown's statement that he had a visual of an airliner on the right, when Nicoll

transmitted: "*FedEx thirteen fifty nine, traffic on a four mile left base for one six left, six thousand two hundred feet, bonanza, they do have you in sight.*" (*See* Ex. 26 at 0058:25 UTC.) Brown never questioned this transmission made on the tower radio frequency.

33.     FedEx Flight 1359, however, confirmed receipt of this transmission, stating, "*thirteen fifty nine we're looking*[.]" (*Id.* at 0058:31 UTC.) This further suggests that Brown was looking at FedEx Flight 1359 because he was given two opportunities to correct any misunderstanding (from Nicoll and this transmission from FedEx Flight 1359) had there been one and did not take either opportunity.

34.     Indeed, the government's pilot expert Schiff said as much. (ECF No. 164 at 101 (accepting him as a pilot expert).) Schiff testified that a reasonably prudent pilot would understand that a plane about to land would not be concerned about another plane four miles from the airport. Therefore, even if Brown had misidentified his traffic, he should have realized his mistake at this time. (*Id.* at 174.)

35.     In addition, Nicoll explained at Trial he believed that Brown had FedEx Flight 1359 in sight and accepted responsibility to maintain visual separation from that aircraft. (ECF No. 158 at 173.)

36.     Schiff also opined that Brown should have seen FedEx Flight 1359 as it crossed from right to left in front of Brown's aircraft based on his "countless hours as a pilot doing the same thing" and a second investigation flight he conducted at RNO "to prove it to myself[.]" (ECF No. 164 at 126-27.)

37.     In sum, the Court finds that Brown had FedEx Flight 1359 in sight at the moment he stated he had an airliner in sight off to his right. (Ex. 26 at 0058:18 UTC ("*and tower five charlie alpha got a visual on the airliner for the for the right*").) Despite this, Brown failed to avoid FedEx Flight 1359's wake vortices. And as noted at the outset, it was the encounter with wake vortices from FedEx Flight 1359 that caused Brown's plane to crash, killing Brown and Elliker.

///

38.     That brings the Court to the factual component of the other major dispute between the parties: whether Nicoll had transferred responsibility to Brown to maintain adequate separation from FedEx Flight 1359 before Brown's fatal encounter with its wake vortices. As further explained below, the Court agrees with the government that Nicoll did. But for now, the Court discusses the factual components of this decision.

39.     To start, Nicoll testified that he thought he had transferred responsibility to Brown to maintain adequate separation, explaining that having "visual" contact with an aircraft indicates that a VFR pilot will maintain visual separation from that aircraft and avoid its wake turbulence because that is what VFR pilots are supposed to do. (ECF No. 158 at 173-75.) The Court finds the testimony of Nicoll to be credible and persuasive. The Court gives his testimony significant weight as Nicoll was the only witness at Trial who spoke to Brown and directly observed the flight paths of the aircraft involved prior to the accident.

40.     Nicoll's testimony is also consistent with FAA guidance to pilots stating that pilots maintain ultimate responsibility to avoid wake turbulence regardless of what air traffic control tells them. (*See* Ex. 32 at 511 ("WHETHER OR NOT A WARNING OR INFORMATION HAS BEEN GIVEN, HOWEVER, THE PILOT IS EXPECTED TO ADJUST AIRCRAFT OPERATIONS AND FLIGHT PATH AS NECESSARY TO PRECLUDE SERIOUS WAKE ENCOUNTERS.") (emphasis in original).)

41.     The Court also reiterates that Nicoll did warn Brown about wake turbulence from FedEx Flight 1359. (ECF No. 158 at 162-63; *see also* Ex. 26 at 57:18 UTC.) This dovetails with the Court's finding above that Brown spotted FedEx Flight 1359.

42.     The parties' dispute instead centers on whether, in order to transfer responsibility to maintain adequate separation with FedEx Flight 1359 to Brown, Nicoll had to make an additional radio transmission that he admittedly did not make, to again tell Brown to "maintain visual separation." Plaintiffs also argue that Nicoll did not transfer responsibility to Brown because he did not indicate the position of FedEx Flight 1359 using a 12-hour clock position. (ECF Nos. 170 at 11-12, 171 at 7.)

43.     The Air Traffic Control manual ("ATC Manual") contains provisions for the application of pilot-provided visual separation. (ECF No. 158 at 144 (referring to the manual as 'the 7110' and as Ex. 21 at page 325).) The pertinent page of the ATC Manual provides as follows:

> **2.** Pilot-applied visual separation.
>
>    **(a)** Maintain communication with at least one of the aircraft involved and ensure there is an ability to communicate with the other aircraft.
>
>    **(b)** The pilot sees another aircraft and is instructed to maintain visual separation from the aircraft as follows:
>
>        **(1)** Tell the pilot about the other aircraft. Include position, direction, and, unless it is obvious, the other aircraft's intention.
>
>        **(2)** Obtain acknowledgment from the pilot that the other aircraft is in sight.
>
>        **(3)** Instruct the pilot to maintain visual separation from that aircraft.

(Ex. 21 at 325.) A nearby recommendation also states that air traffic controllers should identify the traffic using clock position. (*Id.*) Plaintiffs vehemently argued at Trial that Nicoll's failure to follow step (3) noted above or use a 12-hour clock position made him responsible for Brown's crash, not Brown—because Nicoll never transferred responsibility to Brown to maintain visual separation. The Court disagrees.

44.     Nicoll acknowledged at Trial that he did not use the words "maintain visual separation," as specified in the ATC Manual, after Brown stated that that he had a "visual" on FedEx Flight 1359. (ECF No. 158 at 148.) But at the time Nicoll called out traffic for Brown and cautioned him regarding wake turbulence, Nicoll understood that Brown would accept responsibility for wake turbulence separation. (*Id.* at 146.) As noted, Nicoll's understanding was based in part on the fact that Brown said he had "visual" contact with FedEx Flight 1359 (*"the airliner for the for the right"*). (*Id.* at 149-150, 263.)

45.     Moreover, near the time Brown squared off his base leg, two separate collision alerts momentarily activated on the radar display in the tower. At these times, Nicoll observed both aircraft out of the tower windows. He saw FedEx Flight 1359 on final

for Runway 16R, and he saw Brown about a mile away on the base leg. Based on the distance between the aircraft, the direction of travel, and their relative speeds, Nicoll determined there was no risk for a collision. Nicoll also observed Brown maneuvering to maintain visual separation, and thus determined no "safety alert" was necessary. (*Id.* at 165-167, 176-177, 283-284.) In describing to the Court what he saw out of the tower windows, and explaining what he saw on the tower radar scope (*see* Ex. 597), Nicoll stressed that; (1) what he observed was "very typical of what we see when small aircraft, landing on One Six Left, with the large aircraft landing on One Six Right;" (2) the "radar scope will look exactly like" it did on the day of the accident; and (3) the flight paths of FedEx Flight 1359 and Brown in relation to one another were typical and normal. (ECF No. 158 at 202, 283-284.)

46.     Nicoll also observed Brown proceed to the airport while keeping FedEx Flight 1359 in sight, and Brown appeared to adjust his flight path by squaring off his base leg to maintain visual separation from the larger Boeing 757 aircraft. (*Id.* at 173-175.) These actions indicated to Nicoll that Brown would maintain visual separation from FedEx Flight 1359 and accept responsibility to avoid its wake turbulence. (*Id.*)

47.     Thus, Nicoll did not need to explicitly tell Brown another time to 'maintain visual separation.' It was not necessary in context.

48.     In addition, Nicoll stated that ATC Manual paragraph 7-6-7.c.2 prohibits allowing a heavy aircraft from overtaking a small VFR aircraft established on final. (*Id.* at 290-91; *see also* Ex. 21 at 340.) But Nicoll persuasively explained that he complied with this provision because Brown was on his base leg, not established on final, when FedEx Flight 1359 crossed from right to left, and thus there was no "overtake" by FedEx Flight 1359. (ECF No. 158 at 290-91.)

49.     Plaintiffs' air traffic control expert Canoles offered some contrary testimony, but ultimately conceded that the provision of the ATC Manual he was relying on only applies to IFR ("Instrument Flight Rules") aircraft on visual approaches being conducted

simultaneously to parallel runways, and that Brown was not on an IFR flight plan or a visual approach at the time of the accident. (*Id.* at 133-135.) Canoles also admitted he is not an aviation accident reconstruction expert. (*Id.* at 25.) For these two reasons, the Court does not find Canoles' testimony entirely credible.

50.    Plaintiffs' pilot expert Steiner also testified that he had determined that FedEx Flight 1359 overtook Brown on final, just like Canoles, but on cross-examination admitted this was a mistake. (ECF No. 159 at 157-58.) Steiner also acknowledged that the reconstruction prepared by the government's expert Orloff, which shows FedEx Flight 1359 about one mile away when Brown turned final, is consistent with the factual information prepared by the NTSB (National Transportation Safety Board). (*Id.* at 143-44.) The Court accordingly does not find Steiner particularly credible either.

51.    In contrast, the Court finds the government's aviation accident reconstruction expert Orloff credible. (ECF No. 162 at 223-24 (accepting him as an expert).) He has a doctorate in aeronautical engineering, has taught aeronautical engineering at the university level, worked for NASA, and is currently certified as both a cargo transport pilot and a flight instructor who has flown many hours in Beechcraft Bonanzas. (Ex. 36 at 1-2.) Moreover, he has "consulted and testified in the area of aviation accident reconstruction, flight path analysis, and accident causation literally hundreds of times since 1984." (*Id.* at 2.)

52.    Orloff determined that at the time Brown began his descending left turn from base to final, FedEx Flight 1359 was near the runway, about a mile away. (ECF No. 163 at 58-61, 73-76.)

53.    Orloff also determined that, prior to the turn to final, Brown was on a close-in base leg. (Ex. 36 at 5.) While on base, "Fed Ex 1359 passed directly in front of N985CA, within 1 nautical mile and nominally at the same altitude." (*Id.*)

54.    "At about 6:00:45 pm, Pilot Brown began a left turn, aligning N985CA on final approach for Runway 16L, continuing the descent." (*Id.*)

55.    The Court agrees and finds that Brown was in a left turn to his dog leg towards RNO at the time Nicoll provided the traffic advisory. (*See* Ex. 105 at Figure 1; Ex. 624.)

56.    During his turn from base to final, Brown descended from 4881 feet through 4681 feet, and encountered the wake of FedEx Flight 1359 shortly thereafter. (Ex. 626.) Orloff concluded that while Brown was descending on the turn to final, his aircraft "would have been flying a lower profile than FedEx in order to encounter the wake." (ECF No. 163 at 69.)

57.    Moreover, Orloff determined that FedEx Flight 1359 was always in Brown's field of view as he made his final approach to RNO and therefore was always in front of the Bonanza Brown was piloting. (*Id.* at 39.)

58.    And Orloff's reconstruction is consistent with the NTSB factual report, which states that, when Brown's Bonanza "began its left turn onto final for runway 16L . . . the FedEx B757 was about 1 mile from the accident airplane, approximately at its 10 to 11 o'clock position." (Ex. 106 at 10; *see also* Ex. 105 at Figure 3.)

59.    Thus, FedEx Flight 1359 did not come from behind Brown's Bonanza and overtake it on final approach. The Court accepts Orloff and Nicoll's testimony to this effect and rejects Canoles and Steiner's contrary testimony as less persuasive.

60.    As to Nicoll's decision not to tell Brown where FedEx Flight 1359 was using a 12-hour clock position, Nicoll explained that using a clock position for a traffic call in this situation would not be effective because Brown was in the process of turning base and the clock position would be constantly changing. (ECF No. 158 at 247-49.)

61.    Schiff testified consistently that when an aircraft is turning, it would be confusing to a pilot to be given traffic using a clock position. (ECF No. 164 at 155-57.) A traffic advisory, like the one Nicoll issued, using a location on final, on the other hand, would be more specific and useful to a pilot. (*Id.*)

///

62.     In addition, the government's expert on air traffic control procedures and standards of care, Turner (ECF No. 163 at 177 (certifying him as such)), testified that the method Nicoll used to provide Brown a traffic advisory was appropriate, complies with paragraph 3-8-1 of the ATC Manual, and reflected that Nicoll exercised his best judgment because Brown was in a turn at the time and a clock position would not be effective. (*Id.* at 196-200.) If there was any confusion about the location of the traffic, a controller expects a pilot to ask for clarification, and, as noted, Brown did not ask for clarification. (*Id.* at 195-96.) Indeed, rather than indicate confusion, Brown stated he was looking for the traffic Nicoll reported to him and later stated he had the traffic in sight. (Ex. 26 at 0057:31-0058:18 UTC.)

63.     The ATC Manual also contemplates situations where "rapidly maneuvering aircraft prevent issuance of traffic" advisories using a clock position. (Ex. 21 at 48.) The ATC Manual further provides example phraseology where aircraft are identified by location on a certain "mile final." (*Id.* at 153, 157.)

64.     Plaintiffs' experts Burgess and Steiner failed to address traffic advisories when an aircraft is in a turn and a clock position would not be effective in identifying traffic, as described in the ATC Manual. Their testimony, therefore, is not persuasive. The Court instead finds the testimony of the government's experts Nicoll, Schiff, and Turner more persuasive and in agreement with the guidance of the ATC Manual.

65.     FedEx Flight 1359 did not overtake Brown's Bonanza on final.

**III.     CONCLUSIONS OF LAW**

As noted, Plaintiffs allege that the negligence of FAA air traffic controllers at RNO was the sole cause of the crash. The Court makes the following findings of law.

1.     In actions under the FTCA—such as this one—the Court must apply the whole law of the state where the negligent act or omission occurred. *See Richards v. United States*, 369 U.S. 1, 11 (1962). The accident in this case occurred in Reno, Nevada.

1    There is no dispute that the law of Nevada applies to all issues in this case. (ECF Nos.

2    170 at 24-25, 171 at 22-23, 172 at 81.)

3        2.    "Negligence is failure to exercise that degree of care in a given situation

4    which a reasonable [wo]man under similar circumstances would exercise." *Driscoll v.*

5    *Erreguible*, 482 P.2d 291, 294 (1971) (describing Nevada law) (citation omitted).

6        3.    In Nevada, "[t]o prevail on a negligence theory, a plaintiff must generally

7    show that: (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached

8    that duty; (3) the breach was the legal cause of the plaintiff's injury; and (4) the plaintiff

9    suffered damages." *Scialabba v. Brandise Const. Co., Inc.*, 921 P.2d 928, 930 (Nev.

10    1996). Plaintiffs must establish negligence by a preponderance of the evidence. *See, e.g.*,

11    *Arrowhead Freight Lines, Ltd. v. White*, 287 P.2d 718, 719-20 (Nev. 1955) (describing the

12    standard in negligence cases as a preponderance of the evidence).

13        4.    And "[w]hile general negligence law applies to airplane tort cases, the

14    standard of due care is concurrent, resting upon both the airplane pilot and ground aviation

15    personnel." *Spaulding v. United States*, 455 F.2d 222, 226 (9th Cir. 1972) (citations

16    omitted). "Both are responsible for the safe conduct of the aircraft." *Id.*

17        5.    "The air traffic controller is required to give all information and warnings

18    specified in his manuals, and in certain situations he must give warnings beyond the

19    manuals." *Id.* (footnotes omitted).

20        6.    However, "[t]he controller's duty to warn does not, however, relieve the pilot

21    of his primary duty and responsibility." *Id.* "The pilot has a continuing duty to be aware of

22    danger when he can gather adequate information with his own eyes and instruments." *Id.*

23    at 226-27 (footnote omitted).

24        7.    Brown was the pilot in command ("PIC") of the Bonanza at the time of the

25    crash. (ECF No. 115 at 3.)

26        8.    As PIC, Brown was "directly responsible for, and [was] the final authority as

27    to, the operation of that aircraft." 14 C.F.R. § 91.3(a).

28

9.     In addition, 14 C.F.R. § 91.13(a) provides that: "[n]o person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another."

10.     The governing principle for pilots flying under VFR is that they must maintain vigilance to see and avoid other aircraft. *See* 14 C.F.R. § 91.113(b) ("[V]igilance shall be maintained by each person operating an aircraft so as to see and avoid other aircraft.").

11.     "While the duty in an airplane tort case is a concurrent one, resting on both the control tower personnel and the pilots, 'under VFR conditions, ultimate responsibility for the safe operations of an aircraft rests with the pilot.'" *Beech Aircraft Corp. v. United States*, 51 F.3d 834, 840 (9th Cir. 1995) (quoting *Hamilton*, 497 F.2d at 374).

12.     "Moreover, 'controllers are not required to foresee or anticipate the unlawful, negligent or grossly negligent acts of pilots.'" *Id.* (citation omitted).

13.     "Under Visual Flight Rule (VFR) weather conditions, the pilot's duty to see and avoid other aircraft also includes the requirement that he exercise the same degree of caution to visualize and avoid wake turbulence encounters with other aircraft." *Mgmt. Activities, Inc. v. United States*, 21 F. Supp. 2d 1157, 1176 (C.D. Cal. 1998) (citations omitted).

14.     "Even at controlled airports where air traffic controllers help direct pilots, the primary and ultimate responsibility for safe aircraft operation under visual flight rules, including wake turbulence avoidance, rests with the pilot." *Dyer v. United States*, 832 F.2d 1062, 1070 (9th Cir. 1987) (citation omitted).

15.     As noted *supra*, Brown was operating under VFR conditions at the time of the accident.

16.     Brown's failure to avoid the wake turbulence generated by FedEx Flight 1359 was the sole, proximate cause of the accident.

17.     Nicoll reasonably did not observe anything unusual about the Bonanza Brown was flying at any time before the crash. As explained *supra* in the Findings of Fact, Nicoll had every reason to believe, and reasonably did believe, that Brown would follow

the applicable wake turbulence procedures and maintain a safe altitude above the flight path of FedEx Flight 1359. *See, e.g.*, *Beech*, 51 F.3d at 840 (suggesting it is appropriate to consider the reasonableness of any inferences an air traffic controller drew based on what they could observe in determining whether they were negligent); *see id.* (affirming the district court's finding that the air traffic controllers were not negligent); *Ellen v. United States*, 32 F. App'x 270, 275 (9th Cir. 2002) ("The standard remains reasonableness, while its application varies in light of the increased danger and a controller's duty to render maximal assistance in emergencies.").

18.    Had Brown exercised the standard of care expected of a pilot, particularly one of his experience and qualifications, and adhered to standard wake turbulence avoidance procedures, the accident would not have happened.

19.    Brown violated at least 14 C.F.R. § 91.13(a) and 14 C.F.R. § 91.113(b) by negligently placing himself and his passenger in a position below the flight path of FedEx Flight 1359, thus encountering its wake turbulence.

20.    Brown's negligence was the sole cause of the crash. *See Dyer*, 832 F.2d at 1070-71 (finding the pilot's failure to avoid wake turbulence under VFR conditions was the sole, substantial reason for the crash); *Mgmt. Activities, Inc.*, 21 F. Supp. 2d 1157, 1179 ("this Court cannot find that the Defendant was negligent or that the conduct of the Westwind flight crew, in failing to avoid the wake turbulence from United 103, was reasonably foreseeable by *any* employee of the Defendant, or that any such employee violated a duty owed to Plaintiffs, or that any such employee's conduct was a factor, let alone a substantial contributing factor, in the accident.").

21.    As noted, Plaintiffs argue that Nicoll is responsible for the crash because he failed to tell Brown to "maintain visual separation" after Nicoll warned Brown of the Boeing 757 and its wake turbulence, and Brown reported having the airliner in sight. But the underlying intent of the ATC Manual provision Plaintiffs argue Nicoll violated was accomplished because Brown was applying visual separation. This three-word omission

was immaterial and not a proximate cause of the crash. Further, Brown's actions, after seeing FedEx Flight 1359 and reporting it in sight, demonstrated that he chose to maintain visual separation from it by flying the route, profile, speed and rate of descent of his choice to the runway without awaiting an instruction or recommended heading from the RNO tower.

22. The same goes for Plaintiffs' argument regarding Nicoll's failure to give 12-hour-clock directions to Brown as to the position for FedEx Flight 1359. It was reasonable for him not to because Brown was turning at the time. And in any event, Brown saw FedEx Flight 1359. But Brown nonetheless got too close to its wake turbulence.

23. It was not reasonably foreseeable that Brown would descend into FedEx Flight 1359's wake turbulence after being warned about it, seeing it, and confirming to Nicoll that he saw it, and for this reason as well, Nicoll was not negligent with respect to Brown or his passenger Elliker. Nicoll was not required to, nor could he, anticipate the conduct of Brown in descending below the flight path of FedEx Flight 1359 during his turn onto the final leg of the traffic pattern for runway 16L.

24. Indeed, Brown unreasonably accepted a known threat of danger by turning to final behind FedEx Flight 1359 after seeing it, and descending into that aircraft's wake turbulence, a threat about which he should have known based on what was obvious out his window. This is particularly the case because Brown was an experienced pilot who regularly operated in and out of RNO, an airport with parallel runways that serves air-carrier aircraft.

25. And while Plaintiffs also contend that Nicoll should have also warned Brown about UPS Flight 9706 in his traffic advisory, the Court is unpersuaded. At the time Nicoll issued the traffic advisory, UPS Flight 9706 was on a three-mile final. (ECF No. 163 at 18-19.) UPS Flight 9706 was accordingly not a factor to Brown because that aircraft was about to land and far enough ahead of Brown such that it did not pose a wake turbulence threat to him. (ECF No. 164 at 165.) And Schiff testified that a reasonably prudent pilot

would expect to be told only about traffic that is a factor to him. (*Id.*) The Court agrees with Schiff. Moreover, from listening to the radio communications, as explained *supra* in the Findings of Fact, Brown would have known there were three aircraft ahead of him as he approached RNO and their general locations and intentions. Brown was given all the information he needed at the time to safely fly the Bonanza. Nicoll was not required to specifically warn him about UPS Flight 9706 in his traffic advisory.

26.    In sum, Plaintiffs failed to establish either the breach or causation elements of their negligence claim by a preponderance of the evidence. Nicoll and the other controllers in the RNO tower did not breach any duties they owed Brown and Elliker. Brown's negligence was the sole and proximate cause of the crash, not any action or omission on Nicoll or the other controllers in the RNO tower's part.

27.    Plaintiffs are accordingly not entitled to any damages.

## IV.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and has determined they do not materially affect the outcome of this case.

It is therefore ordered that Defendant the United States of America prevails in this case as specified herein.

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 26th Day of October 2022.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE